INDEPENDENT INSURANCE AGENTS OF AMERICA, INC., et al., Appellees,

v.

**John D. HAWKE, Jr., Comptroller of the Currency, and the Office of the Comptroller of the Currency, Appellants.**

No. 99–5158.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 2000.

Decided May 16, 2000.

Douglas B. Jordan, Special Counsel, U.S. Department of Treasury, argued the cause for appellants. With him on the briefs were Robert B. Serino, Deputy Chief Counsel, L. Robert Griffin, Director, Horace G. Sneed, Assistant Director, and F. Thomas Eck, IV, Senior Trial Attorney.

Chrys D. Lemon, John J. Gill and Michael F. Crotty were on the brief for amici curiae American Bankers Association and Association of Banks in Insurance.

Scott A. Sinder argued the cause and was on the brief for appellees.

Before: SENTELLE, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Circuit Judge HENDERSON concurs in the result.

SENTELLE, Circuit Judge:

In 1864, Congress granted national banks the power to "exercise ... all such incidental powers as shall be necessary to carry on the business of banking." Act of June 3, 1864, ch. 106, § 8, 13 Stat. 99, 101 (codified at 12 U.S.C. § 24 (Seventh) (1994)). Fifty-two years later, Congress enlarged that grant by conferring the power to act as general insurance agents to national banks located in towns with a population not in excess of five thousand. *See* Act of Sept. 7, 1916, ch. 461, 39 Stat. 752, 753–54 (codified at 12 U.S.C. § 92 (1994)). In 1999, Congress further enlarged bank powers by allowing financial subsidiaries of "well capitalized and well managed" national banks to engage in a wide variety of insurance activities both as an agent and broker. Gramm–Leach–Bli-

ley Act, Pub.L. No. 106–102, §§ 103(a), 121, 113 Stat. 1338, 1342–50, 1373–81 (1999).

The Office of the Comptroller of the Currency ("Comptroller" or "OCC"), defendant-appellant here, determined in 1997 that all national banks may sell as agent general casualty insurance to protect against the risk of crop loss, under sole authority of the original 1864 grant of power. Appellees, Independent Insurance Agents of America, Inc., National Association of Professional Insurance Agents, Inc., National Association of Life Underwriters, National Association of Mutual Insurance Companies, and Crop Insurance Research Bureau (collectively "IIAA"), filed suit in the district court claiming that this interpretation was incorrect as a matter of law. The district court agreed and granted summary judgment for appellees in an order signed March 23, 1999. *See Independent Ins. Agents of Am., Inc. v. Hawke*, 43 F.Supp.2d 21 (D.D.C.1999). The Comptroller appeals, joined by two associations representing banking interests as *amici curiae*. We affirm.

## I. Background

### A. History

■ National banks, being creatures of statute, possess only those powers conferred upon them by Congress. *See Texas & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245, 253, 54 S.Ct. 416, 78 L.Ed. 777 (1934); *First Nat'l Bank of Charlotte v. National Exch. Bank of Baltimore*, 92 U.S. 122, 128, 23 L.Ed. 679 (1875). The National Bank Act of 1864, Act of June 3, 1864, ch. 106, 13 Stat. 99 (codified as amended in scattered sections of 12 U.S.C.), as amended, provides for the chartering of national banks. As part of this statutory regime, 12 U.S.C. § 24 (Seventh) confers the following powers upon national banks:

> [National banks shall have the power] [t]o exercise ... all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes....

12 U.S.C. § 24 (Seventh) (1994). The most pertinent phrase to this case is "all such incidental powers as shall be necessary to carry on the business of banking"; the following enumeration of powers is only illustrative and the Comptroller may authorize additional activities if encompassed by a reasonable interpretation of § 24 (Seventh). *See NationsBank v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n. 2, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) ("*VALIC*"); *American Ins. Ass'n v. Clarke*, 865 F.2d 278, 281–82 (D.C.Cir. 1988).

■ The Comptroller's authority to confer "all such incidental powers as shall be necessary to carry on the business of banking" has been interpreted to mean powers "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers...." *Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir.1972). Whether a particular banking device's nomenclature harkens to traditional banking activities is not dispositive. Instead, the "powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking." *M&M Leasing Corp. v. Seattle First National Bank*, 563 F.2d 1377, 1382 (9th Cir.1977).

For example, in *M & M Leasing*, the Ninth Circuit upheld the Comptroller's determination that national banks may "lease" personal property when the transaction is functionally identical to a secured loan. *See id.* at 1380, 1383. Similarly, in *American Insurance Association*, we held that national banks may offer "municipal bond insurance" which was actually the functional equivalent of a standby letter of

credit, a traditional banking device. *See* 865 F.2d at 281–84.

In *Independent Bankers Ass'n of America v. Heimann,* 613 F.2d 1164 (D.C.Cir. 1979), we recognized the right of national banks to offer "credit life insurance." That product names the bank as beneficiary, not the bank customer, and is a principal form of security for consumer loans. We noted that "[u]nlike other forms of insurance coverage ... credit life insurance is a limited special type of coverage written to protect loans." *Id.* at 1170. Because credit life insurance is "essential where ordinary loans on personal security are involved" and does not "involve the operations of a general life insurance business," we approved of the activity. *Id.*; *see also First Nat'l Bank of Eastern Arkansas v. Taylor,* 907 F.2d 775 (8th Cir. 1990) (upholding authority of banks to sell "debt cancellation contracts" to extinguish loan debts in the event of death).

Even in light of the interpretations of § 24 (Seventh) upheld in the above cases, however, when the OCC has undertaken to authorize national banks to sell general forms of insurance it has run into trouble. In 1916, Comptroller John Skelton Williams asked Congress to augment the powers of national banks to offer insurance. In his view, national banks located in "country towns and villages" were in need of additional sources of revenue and should be allowed to more fully compete with state chartered banks. Citing § 24 (Seventh), the Comptroller noted a hurdle to his goal: "National banks are not given either expressly nor by necessary implication the power to act as agents for insurance companies.... " To resolve this situation, the Comptroller asked Congress to grant insurance agency power to national banks, but only those located in small towns. In his view, "it would be unwise and therefore undesirable to confer this privilege generally upon banks in large cities where the legitimate business of banking affords ample scope for the energies of trained and expert bankers." 53 CONG. REC. 11,001 (1916).

Congress acted on the Comptroller's request. It passed an amendment to the Federal Reserve Act, Act of Sept. 7, 1916, ch. 461, 39 Stat. 752 (codified at 12 U.S.C. § 92 (1994)), which provides:

> In addition to the powers now vested by law in the national banking associations organized under the law of the United States any such association located and doing business in any place the population of which does not exceed five thousand inhabitants ... may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company....

12 U.S.C. § 92. Briefly put, this statute authorizes only those national banks located in towns of 5,000 or less to sell insurance as an agent.

In light of this statutory framework, both the Fifth and Second Circuits have rejected attempts by the Comptroller to authorize *all* national banks to sell insurance, purportedly under the authority of the incidental powers clause of § 24 (Seventh). *See Saxon v. Georgia Ass'n of Indep. Ins. Agents, Inc.,* 399 F.2d 1010 (5th Cir.1968); *American Land Title Ass'n v. Clarke,* 968 F.2d 150 (2d Cir.1992) ("*ALTA*").[1]

---

**1.** Two other circuits have embraced the same reading of national banking statutes as *Saxon* and *ALTA* without discussion. *See Commissioner v. Morris Trust,* 367 F.2d 794, 795 (4th Cir.1966) ("[A] national bank is prohibited from operating an insurance department except in towns having a population of not more than 5000 inhabitants."); *First Sec. Bank of Utah, N.A. v. Commissioner,* 436 F.2d 1192, 1195–96 (10th Cir.1971) (citing *Saxon* and *Morris Trust*), *aff'd,* 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972). The Supreme Court has recognized this case law, but has had no occasion to pass on the issue. *See*

In *Saxon*, the Comptroller decided, without further congressional authorization, that " '[i]ncidental to the powers vested in them under 12 U.S.C. Section[ ] 24 ..., National Banks have the authority to act as agent in the issuance of insurance which is incident to banking transactions.' " *Saxon*, 399 F.2d at 1012 (quoting O.C.C. Ruling No. 7110). The ruling was not limited to locales of less than 5,000 persons. A group of insurance agents brought a declaratory judgment action asking the court to hold the Comptroller's ruling unlawful. On appellate review, the Fifth Circuit held that § 24 (Seventh) could not confer general insurance powers when considered in conjunction with the implications of § 92. *See id.* at 1013–16. Judge Thornberry's concurrence shed light on the basic dilemma: "From an economic standpoint, it may be unfortunate that this Court is interfering with the expansion of national banks ..., but the banks should look to Congress, not the Comptroller." *Id.* at 1021 (Thornberry, J., concurring specially).

The scenario was similar in the Second Circuit *ALTA* case. There, the OCC issued an interpretative letter in 1986 allowing any national bank to act as agent in the general sale of title insurance. *See ALTA*, 968 F.2d at 151. Relying on this interpretation, the Comptroller authorized a national bank to sell title insurance as agent to borrowers and lenders in connection with real estate loans made by the bank. The Comptroller attempted to distinguish *Saxon* on the grounds that title insurance, unlike the broader range of activities authorized in *Saxon*, was essential to a bank's ability to provide financing. The Second Circuit rejected this interpretation, noting that the *Saxon* court did not look to the nature of the insurance activity authorized. *See id.* at 155–57. Rather, the *ALTA* court recognized that § 92 applies to "any ... insurance company," and that "a title insurance company is surely

an insurance company." *Id.* at 156 (internal quotation marks omitted). The court held that even if § 24 (Seventh) could be read to encompass the general sale of title insurance, § 92 precluded such a reading.

### B. The Present Controversy

The facts of this case are a rerun of those in *Saxon* and *ALTA*. Though the OCC is surely familiar with its past defeats, it seems determined to repeat them.

On December 29, 1997, the OCC issued a letter ruling that "a national bank may offer, as agent, multiple peril crop insurance and hail/fire insurance (collectively, 'crop insurance')...." (footnotes omitted). The product insures against "unavoidable losses on crops, including losses due to drought, excess moisture, insects, disease, flood, hail, wind and frost." If a farmer's average yield drops below the insured level, the insurance company pays the difference directly to the farmer.

The Comptroller ruled that the sale of crop insurance was within the "business of banking" for three reasons: (1) crop insurance is similar to credit-related insurance which banks may offer and is a "logical outgrowth" of the bank's power to make loans because it assists banks in making recovery from borrowers; (2) crop insurance is something that benefits farmers and banks by protecting against risks; and (3) the risks are similar to those already borne by national banks in the sale of insurance authorized under 12 U.S.C. § 92 or elsewhere. The Comptroller further concluded that even if the sale of crop insurance was not part of the business of banking, it was "incidental" to that business. In a footnote, the agency stated that the prior circuit decisions in *Saxon* and *ALTA* were not applicable because those decisions were only concerned with "broad forms" of insurance.

The district court rejected the Comptroller's interpretation. Citing *Saxon* and

*VALIC*, 513 U.S. at 260–61, 115 S.Ct. 810; *Commissioner v. First Sec. Bank of Utah, N.A.,*

405 U.S. 394, 401–02, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972).

*ALTA* approvingly, and relying on the interpretative cannons of giving each provision of a statute meaning and *expressio unius est exclusio alterius,* the court reasoned that § 92 was "intended to remedy what Congress saw to be the limited powers of section 24 (Seventh)" and thus compelled the conclusion that all national banks did not have general insurance powers. *IIAA,* 43 F.Supp.2d at 24. The court rejected the suggestion that "crop insurance" is actually a credit-related product, like the credit-life insurance approved in *Heimann. See id.* at 25–26. Unlike the product in *Heimann,* payable to the bank, crop insurance protects farmers and does not guarantee repayment to lenders like a traditional security device.

## II. Analysis

When interpreting the meaning of a federal statute administered by a single agency, we engage in the two-step inquiry of *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). At the first step, we inquire into whether Congress has directly spoken to the precise question at issue. If it has, we must give effect to that express intent. When performing this first step, we employ traditional tools of statutory construction. *See id.* at 843 n. 9, 104 S.Ct. 2778; *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). If the statute before us is silent or ambiguous on the precise issue, we proceed to the second step, where we will defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose. *See, e.g., Nuclear Info. Re-*

*source Serv. v. Nuclear Regulatory Comm'n,* 969 F.2d 1169, 1173 (D.C.Cir. 1992) (en banc).[2]

In this case, our inquiry is whether the "all such incidental powers" language of § 24 (Seventh) includes the power of banks to sell crop insurance. While the word "incidental" may be a poster child for ambiguity, we find that it is not ambiguous in the context of general insurance activities. A broad statute when passed "may have a range of plausible meanings," but subsequent acts can narrow those meanings "where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.,* —— U.S. ——, 120 S.Ct. 1291, 1306, —— L.Ed.2d —— (2000); *see also* G.A. ENDLICH, A COMMENTARY ON THE INTERPRETATION OF STATUTES § 399 (1888) ("[T]he special mention of one thing indicates that it was not intended to be covered by a general provision which would otherwise include it."). Just so here. Because § 92 expressly grants national banks located in small towns the general power to sell insurance as agent, reading § 24 (Seventh) to authorize the sale of insurance by all national banks transgresses both common sense and two traditional rules of statutory interpretation: the presumption against surplusage and *expressio unius est exclusio alterius.*

A broad reading of § 24 (Seventh) to allow the general sale of insurance by national banks would render at least two other related statutes meaningless, in vio-

---

**2.** In *Christensen v. Harris County,* —— U.S. ——, 120 S.Ct. 1655, —— L.Ed.2d —— (2000), decided after oral argument in this case, the Supreme Court held that agency interpretations voiced in opinion letters "do not warrant *Chevron*-style deference." *Id.* at 1662–63. Instead, they are "entitled to respect" under *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), "but only to the extent that those interpretations have the 'power to persuade.'" *Christensen* at 1663 (quoting *E.E.O.C. v. Arabian American Oil Co.,* 499 U.S. 244, 256–58, 111 S.Ct.

1227, 113 L.Ed.2d 274 (1991)). All parties in this case assumed that the normal *Chevron* framework applied to the Comptroller's interpretation of § 24 (Seventh) contained in a letter. *See Independent Ins. Agents of Am., Inc. v. Ludwig,* 997 F.2d 958 (D.C.Cir.1993) (applying *Chevron* step two to a Comptroller letter). We frame part of our analysis in terms of whether the Comptroller's decision is "reasonable," *infra* at 645–46, and our conclusions are equally applicable under the less-deferential standard of *Skidmore* as under *Chevron* step two.

lation of the "endlessly reiterated principle of statutory construction ... that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C.Cir.1995); *see also Halverson v. Slater*, 129 F.3d 180, 185 (D.C.Cir.1997) ("Congress cannot be presumed to do a futile thing."). Why would Congress have passed § 92 to confer insurance authority to some national banks if all national banks already had that power pursuant to § 24 (Seventh)? It would have been completely useless. *See ALTA*, 968 F.2d at 155. Likewise, the Gramm–Leach–Bliley Act authorizes financial subsidiaries established by "well capitalized and well managed" national banks to "[i]nsur[e] ... against loss, harm, damage, illness, disability, or death" as agent or broker. Pub.L. No. 106–102, §§ 103(a) (listing activities that financial holding companies may engage in), 121 (authorizing financial subsidiaries of national banks to engage in some of these activities), 113 Stat. 1338, 1343, 1373–74. If national banks could already sell insurance under § 24 (Seventh), Congress would have no reason to pass a statute limiting that power to financial subsidiaries of only "well capitalized and well managed" national banks.

In addition to the canon of avoiding surplusage, *expressio unius est exclusio alterius* also points to the conclusion that Congress did not intend for all national banks to have insurance powers under § 24 (Seventh). *See Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C.Cir.1995) ("mention of one thing implies the exclusion of another thing") (quoting *American Methyl Corp. v. EPA*, 749 F.2d 826, 835–36 (D.C.Cir.1984)). In context, because § 92 only confers the authority to sell insurance on banks in smaller locales, and because national banks only have the powers granted to them by statute, § 92 strongly confirms the view that the more general grant in § 24 (Seventh) did not include broad insurance powers. *See ALTA*, 968 F.2d at 155–56; *Saxon*, 399 F.2d at 1013–14.

■ The Comptroller argues that the *expressio unius* maxim cannot preclude an otherwise reasonable agency interpretation. This is not entirely correct. True, we have rejected the canon in some administrative law cases, but only where the logic of the maxim--that the special mention of one thing indicates an intent for another thing not be included elsewhere--simply did not hold up in the statutory context. *See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C.Cir.1991); *Clinchfield Coal Co. v. FMSHRC*, 895 F.2d 773, 779 (D.C.Cir. 1990); *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 68–69 (D.C.Cir.1990). As we have noted, if there are other reasonable explanations for an omission in a statute, *expressio unius* may not be a useful tool. *See Clinchfield*, 895 F.2d at 779; *see also Carter v. Director, Office of Workers' Compensation Programs*, 751 F.2d 1398, 1401–02 (D.C.Cir.1985). But, where the context shows that the "draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives," the canon is a useful aid. *Shook v. District of Columbia Finan. Responsibility and Management Assistance Auth.*, 132 F.3d 775, 782 (D.C.Cir.1998); *see also Halverson*, 129 F.3d at 185–87; *Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C.Cir.), *aff'd by an equally divided court*, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989).

In this case, the two canons upon which we rely inarguably compel our holding that § 24 (Seventh) unambiguously does not authorize national banks to engage in the general sale of insurance as "incidental" to "the business of banking." The Supreme Court employed reasoning identical to ours in *Texas & Pacific Railway Co. v. Pottorff*, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777 (1934). There, the Court considered whether a national bank has the incidental power under § 24 (Seventh) to pledge its assets to secure a private deposit. The

Court found no evidence that such a pledge was in any way incidental to banking, and furthermore reasoned that if this power was authorized, there would have been no need to later alter 12 U.S.C. § 1290 to provide a limited power to pledge. *See id.* at 257–59, 54 S.Ct. 416. The pre-*Chevron* vintage of *Pottorff* is irrelevant; the High Court had already made clear by that time that interpretations of the Comptroller merit deference. *See First Nat'l Bank in St. Louis v. Missouri,* 263 U.S. 640, 658–59, 44 S.Ct. 213, 68 L.Ed. 486 (1924).

Even in light of the inherent ambiguity of the "incidental" phrase of § 24 (Seventh), we nonetheless do not find that the statute is ambiguous here within the meaning of *Chevron.* To the contrary, the instant case and *Pottorff* both suggest that the cannons of avoiding surplusage and *expressio unius* are at their zenith when they apply in tandem. *Cf. Halverson,* 129 F.3d at 184–86; ENDLICH, *supra,* at § 399. Under the first step of *Chevron,* we hold that Congress has not authorized the Comptroller to permit the sale of crop insurance solely under the authority of § 24 (Seventh).

To the extent any ambiguity remains on the issue, we conclude that the Comptroller's interpretation of § 24 (Seventh) is not reasonable. Crop insurance is a general form of property or casualty insurance protecting farmers against many potential disasters. It falls squarely within the types of insurance held unauthorized in *Saxon* and *ALTA.* Unlike the special credit-life product which we approved in *Heimann,* the beneficiary of crop insurance is the farmer-insured, not the bank. If the sale of crop insurance is "incidental" to banking under § 24 (Seventh), there would be no way of distinguishing other general forms of insurance. Agriculturalists undoubtedly rely on banks to obtain loans, but so do other individual and corporate borrowers who may also wish to purchase property or casualty insurance to protect their interests. Nothing about "crop insurance" leads to a conclusion that it can be treated differently than other general forms of insurance under national banking laws just because its coverage is limited to farmers.

The OCC supports its interpretation on the grounds that the sale of crop insurance involves risks similar to those already assumed by banks, would benefit customers, and would be a "logical outgrowth" of current bank activities. The Comptroller cites as support, for example, the experience of national banks in small locales in selling all types of insurance under 12 U.S.C. § 92. However, that activity is statutorily authorized. While the sale of crop insurance may be a "logical outgrowth" that national banks could apply their prior experience to, that alone cannot constitute legal authorization. If it did, national banks would be able to constantly expand their field of operations on an incremental basis without congressional action. First would be the authority to sell crop insurance, followed by whatever insurance against business risks of a bank customer is the next "logical outgrowth." There would be no logical stopping point. Section 24 (Seventh) cannot bear the weight the Comptroller proposes to place on it under its test. The Comptroller may of course authorize activities under § 24 (Seventh) "within reasonable bounds," but today's interpretation is not within such bounds. *VALIC,* 513 U.S. at 258 n. 2, 115 S.Ct. 810.

## III. Conclusion[3]

In the end, this case may have little practical effect. National banks have the power to sell insurance, including crop insurance, if they meet the requirements of the Gramm–Leach–Bliley Act. However, they do not have the power to sell crop

---

**3.** There is a pending motion by appellees to strike supplemental exhibits of *amici curiae.* That motion is hereby denied.

insurance solely under the authority of 12 U.S.C. § 24 (Seventh). The judgment of the district court is

*Affirmed.*